# In the United States Court of Federal Claims

No. 14-1122C
Filed: October 8, 2015

**FILED**

OCT - 8 2015

U.S. COURT OF
FEDERAL CLAIMS

```
* * * * * * * * * * * * * * * * * *
                                      *
ROBERT A. CORDOVA, as                 *
Administrator of the Estate of        *
General John Sevier,                  *
                                      *
            Plaintiff,                *
                                      *
v.                                    *
                                      *
UNITED STATES,                        *
                                      *
            Defendant.                *
                                      *
* * * * * * * * * * * * * * * * * *
```

**Pro Se Plaintiff; In Forma
Pauperis Application; Motion to
Dismiss; Lack of Subject-Matter
Jurisdiction; Statute of
Limitations**

**Robert A. Cordova**, San Antonio, TX, pro se.

**James W. Poirier**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him were **Reginald T. Blades, Jr.**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, Civil Division, Washington, D.C.

## OPINION

**HORN, J.**

### FINDINGS OF FACT

Pro se plaintiff Robert A. Cordova alleges that he is filing a complaint, followed by an amended complaint, on behalf of the estates of General John Sevier and his son, John Sevier, Jr.,¹ of which, plaintiff asserts, he is "the duly appointed and qualified administratix, de bonis non."² Mr. Cordova initially attempted to file his complaint in the United States Court of Federal Claims on November 18, 2014, along with an Application to Proceed In

---

¹ Although plaintiff purports in the body of his complaint that he brings his claims on behalf of the estate of General Sevier and John Sevier, Jr., the captions of both his initial and amended complaints list only the estate of General Sevier.

² Capitalization, grammar, spelling, punctuation, and other errors are quoted in this Order as they appear in plaintiff's submissions.

Forma Pauperis. This complaint was returned to Mr. Cordova because he had failed to sign the pleading in accordance with Rule 11 of the Rules of the United States Court of Federal Claims (RCFC) (2015). Plaintiff subsequently amended and refiled his complaint. Plaintiff's amended complaint asserts that "[t]his case is brought on the basis that the U.S. has not paid its debt owed to General Sevier, a debt which is valid, legitimized, and verified." Plaintiff alleges four separate claims against the United States, for which he seeks a total of $8,447,594.00, plus interest in compensation.

The claims are briefly summarized as follows. Plaintiff's first claim alleges that in 1783, pursuant to an act of the legislature of North Carolina, "the claimants' descendants [sic] purchased 225, more or less, land warrants representing 174,474 acres of land, more or less." Plaintiff further alleges that some of this land was subsequently "ceded" by the United States to the Cherokee Tribe pursuant to the 1785 Treaty of Hopewell. According to plaintiff's complaint, in February 1790, the State of North Carolina ceded a portion of its western territory, including some of the land held by General Sevier, to the United States, but on the condition that pre-existing property rights in the territory "have the same force and effect as if such cession had not been made." Plaintiff claims that, nonetheless, the United States, pursuant to the 1791 Treaty of Holson, ceded some of the lands owned by General Sevier and John Sevier, Jr. to the Cherokee Nation. Plaintiff also alleges that in a Bill, dated May 19, 1796, Congress established punishments for residents of what had by then become the new state of Tennessee "for doing any act of ownership of lands represented in this claim [that] were within the Indian boundary." Plaintiff claims that North Carolina protested this treaty as "a violation of private rights," and that Congress, in an Act passed April 18, 1806, recognized that the pre-existing property rights of the Sevier lands had not been satisfied. Plaintiff claims that General Sevier and John Sevier, Jr. were never compensated for the expropriation of this land, and seeks total compensation for the first of his claims in the amount of "$8,330,550 with accrued interest thereon at six percent (6%) per annum from August 4, 1790, UNTIL PAID." (capitalization in original).

Plaintiff's second claim relates to a total of approximately 51,000 acres of land in the "Mississippi Valley," 50,000 of which plaintiff claims General Sevier obtained in three transactions in 1797, and 1,000 of which were purchased in 1795 by his son James Sevier.[3] Plaintiff alleges that an April 7, 1798 Act of Congress authorized the establishment of the Mississippi Territory, which, plaintiff claims, included the 51,000 acres purchased by his alleged ancestors. This Act, according to plaintiff, promised that the founding of the Mississippi Territory "should in no respect impair the right of the State of Georgia, or of any other persons to the jurisdiction of the soil of said territory," and that "the right and claims of . . . all persons interested are thereby declared to be as firm as if the Act had never been made." On April 24, 1802, according to plaintiff, the State of Georgia ceded certain lands, including the 51,000 acres on which plaintiff's second claim is based, to the United States for the formation of the Mississippi territory, with a proviso that the United States may set aside 5,000,000 acres of land in order to compensate all claims by dispossessed owners on that ceded land. Further, according to plaintiff's complaint, a March 1803 Act of Congress set aside the 5,000,000 acres, and established

---

[3] Other than being father and sons, plaintiff does not explain the relationship between General Sevier, John Sevier, Jr., James Sevier, and George W. Sevier, discussed below.

a procedure by which claims for compensation could be made. Although plaintiff asserts, with respect to General Sevier's property, "that the title and right to his purchased lands were clearly proven," plaintiff's complaint does not allege that General Sevier or his sons ever made a claim pursuant to the 1803 Act. Plaintiff claims, however, that General Sevier and James Sevier did timely deposit deeds of release related to this property with the Secretary of State on December 31, 1814, pursuant to the procedure described in a March 31, 1814 Act, which, plaintiff alleges, provided for "the indemnification of certain claimants of public lands in the Mississippi Territory." Plaintiff's complaint further states that an 1819 treaty between the United States and Cherokee Indians set aside "a 12 square mile area in the Big Bend of the Tennessee River for the education of said Indians," which allegedly included the 51,000 acres on which plaintiff's second claim is based. Plaintiff, alleges that neither General Sevier nor James Sevier ever were compensated for the dispossession of these lands and seeks compensation in the amount of "$102,000 with accrued interest at six percent (6%) per annum, compounded interest from March 3, 1803, UNTIL PAID." (capitalization in original).

Plaintiff's third claim relates to a grant of 5,000 acres allegedly awarded to General Sevier as compensation for his service as a commissioner appointed "to examine the quantity, quality, etc. of the lands lying in what was called the 'Bend of the Tennessee[.]'" Plaintiff claims General Sevier was appointed to this position pursuant to a February 20, 1784 Act of the Legislature of Georgia, and "that on August 14, 1786, the General Assembly of Georgia adopted a resolution allowing each of the commissioners who served 5,000 acres of land in Tennessee as a gratuity and full compensation for their 'trouble[.]'" According to plaintiff's complaint, General Sevier never received the deed for these 5,000 acres, and the parcel was ultimately ceded by Georgia to the United States in the same 1803 Act referenced above with respect to Mr. Cordova's second claim. Plaintiff claims that, on December 5, 1817, General Sevier's son and the administrator of his estate, George W. Sevier, petitioned Congress to fulfill the promise of 5,000 acres to General Sevier by granting the land to his heirs. According to plaintiff's complaint, Congress responded by granting 5,000 acres to the heirs of General Sevier in an Act passed on May 24, 1824, specifying that this grant should come from the 5,000,000 acres set aside for the compensation of claims in the 1803 Act discussed above with respect to plaintiff's second claim. Plaintiff claims that pursuant to this 1824 Act, "[o]n May 12, 1828 . . . about 20 patents were recorded in the Land Office at Washington, D.C.," but that

native Americans occupied the lands named in said patents . . . and an army of the United States was stationed at that locality to prevent citizens of the United States from going on said lands, which condition prevailed for many years after the death of all the children of General John Sevier . . . .

Plaintiff claims there is no record showing that the patents for this 5,000 acres of land were ever conveyed to General Sevier's heirs. Plaintiff seeks total compensation for this claim in the amount of "$10,000 with six percent (6%) annum compound interest from March 3, 1803, UNTIL PAID." (capitalization in original).

3

Plaintiff's fourth claim concerns military pay that plaintiff claims General Sevier was owed for his service to the United States in the "Ettowa Campaign" from February 22, 1791 to February 22, 1794. Plaintiff claims General Sevier was appointed a Brigadier General in the United States Army for the purposes of conducting a campaign against certain unspecified Indian tribes, and asserts that General Sevier subsequently made "several attempts" to obtain the pay owed to him and the troops he levied for that campaign. Plaintiff claims, with respect to the monies owed to General Sevier for his military service, he is due "a total of $5,044.00."[4] In total, plaintiff claims as compensation for his four claims "the sum of $8,447,594 with accrued interest at six percent (6%) per annum compound interest from the dates hereinbefore stated respectively, UNTIL PAID."[5] (capitalization in original).

The allegations contained in Mr. Cordova's complaint appear to be taken, almost verbatim and without attribution, from the descriptions of the claims in the 1910 United States Court of Claims Congressional Reference case of Emmetts Humphreys, administratrix de bonis non of John Sevier, sr. and John Sevier, jr. v. United States. See H.R. Doc. No. 63-131 (1913) (which quotes the Court of Claims' Humphreys decision in full). As plaintiff notes in his complaint, apparently quoting from Humphreys, the claims in Humphreys were twice referred by the United States Congress to the United States Court of Claims, a predecessor court of this court, the United States Court of Federal Claims, for fact-finding pursuant to the Bowman Act, 22 Stat. 485 (1883). The first referral occurred on or about February 23, 1905 and the second on February 24, 1908. See H.R. Doc. No. 63-131, at 1-2. Like Mr. Cordova, the Humphreys plaintiff, Ms. Emmets Humphreys, claimed that she was "one of the heirs of . . . Gen. John Sevier" and the "duly appointed and qualified administratrix de bonis non of the estates of Gen. John Sevier and of John Sevier, jr." Id. at 2. Ms. Humphreys alleged the same four claims as Mr. Cordova does in the case currently before this court, including that General Sevier and his heirs allegedly owned the identified lands and that the failure of the United States to pay General Sevier the amount due for his services in the Ettowa Campaign is a continuing debt. See id. at 2-5. Ms. Humphreys also sought the same monetary relief as Mr. Cordova does: "the sum of $8,447,594 with accrued interest at 6 per cent per annum, compound interest, from the dates hereinbefore stated, respectively, until paid." Id. at 5. The Court of Claims decided the Congressional Reference case on February 28, 1910 and its findings of fact were transmitted to the House of Representatives on January 23, 1913. See id. at 1, 21. In its findings of fact, the Humphreys court determined that it did not appear that the United States had received any benefit from the lands belonging to

---

[4] The court notes that although this section of plaintiff's complaint makes passing reference to "a balance of $22,817, a sum of which has not been paid" with respect to General Sevier's services on the "Ettowa Campaign of 1793," plaintiff provides no indication of what this sum represents, nor does he appear to be seeking reimbursement for this sum from the United States.

[5] Plaintiff notes that "[t]his number in [sic] not reflective of the calculation from 1910 until present, which will be demonstrated within this document." No such documentation, however, appears to have been provided to this court.

General Sevier. See id. at 8, 13, 14. Mr. Cordova, apparently contesting this conclusion before this court, states, without elaboration, that "[i]t is the contention of the heirs of General John Sevier that the United States in fact benefited from lands in the creation, formation and cession of the States of Tennessee, Georgia, Mississippi and Alabama, all from the lands acquired from what should have been a part of the estate of General John Sevier." Mr. Cordova also asserts that, "by provisions of the Tucker Act granting jurisdiction of this case to the United States Court of Federal Claims," his claim "shall supersede" the Humphreys claim and that "all records and exhibits filed therein should be transferred to and considered in connection therewith."

In February 1925, the Senate Committee on Claims issued a report stating that it had been referred a Bill "making appropriation for payment of claims of John Sevier, sr., and John Sevier, jr., in accordance with report and findings in the Court of Claims." S. Rep. No. 68-991, at 1 (1925). Although not mentioned in plaintiff's initial and amended complaints, the 1925 Senate Report was identified and quoted in full in an undated "Reference Service Report" issued by the General Services Administration, which also provided an overview of the various Sevier claims. Plaintiff attached the GSA Report to his original complaint filed in this court.[6] The Senate Report discussed each of the four claims discussed in Humphreys, which, as noted above, are identical to those in Mr. Cordova's complaints, and recommended that the appropriation Bill be "unfavorably reported and indefinitely postponed." Id. at 5.

With respect to the first claim in plaintiff's complaint, the Senate Report notes that there were "several acts of Congress, passed subsequent to 1800, whereby Gen. John Sevier or John Sevier, jr., were given every opportunity to establish their claims for said land and to obtain compensation as the terms of said Federal acts provided." Id. at 2. In particular, the Senate Report noted the last of these Acts, 5 Stat. 412 (1841), had been enacted on February 18, 1841. S. Rep. No. 68-991, at 3. Because no claim appeared to have been filed under the 1841 Act by the heirs of General Sevier and John Sevier, Jr., nor in the sixty-plus years prior to the claim made by Ms. Humphreys, the Senate Report concluded that "[t]he claim, even if a proper one, seems to have been completely abandoned by all possible parties in interest," which meant that "it does not appear to be equitable or just that at this late date the Federal Government should be called upon to pay out any money upon such a claim," particularly since "the Federal Government never received any benefit while it did hold the ownership to said lands." Id.

With respect to the second claim, the Senate Report stated:

In brief, it appears that in substance opportunity was given by legislative procedure and otherwise, both Federal and by an act passed by the State of Georgia, whereby Gen. John Sevier and John Sevier, jr., or their heirs or legal representatives, could prove and substantiate their claim and receive compensation therefor, but that neither Gen. John Sevier or John Sevier,

---

[6] The 1925 Senate Report also was attached to defendant's Reply to Plaintiff's Amended Response to Defendant's Motion to Dismiss.

jr., nor their heirs or legal representatives saw fit so to do, and in this case a period of time seems to have lapsed between 1822 and 1907, a period of over 80 years, during which Gen. John Sevier, John Sevier, jr., their heirs or legal representatives, have abandoned all claim.

Id. Given the apparent abandonment of this claim, the report concluded that "[y]our committee is unable to find any just or equitable reason for any compensation to be awarded the claimant under this head." Id. at 4.

As for the third claim, the Senate Report cited the Court of Claims' findings of fact as follows:

[L]ocations were made by the heirs of John Sevier, through their duly authorized attorney, for the number of acres due John Sevier under said act of May 24, 1824, and that patents were duly issued to the heirs and legal representatives of the said John Sevier between June 12, 1828, and February 26, 1834.

It is further shown that the United States did not at any time receive any benefit from the original lands upon which John Sevier based his claim.

Your committee, therefore, reports that, in its opinion, no just, legal, or equitable claim can be sustained in favor of either Gen. John Sevier, John Sevier, jr., or their heirs or legal representatives, under claim No. 3.

Id. Regarding the fourth claim concerning General Sevier's military pay, the Senate Report stated that "General Sevier himself . . . served in the Twelfth and Thirteenth Congresses, but the record nowhere discloses the fact that he made application either to Congress or to the War Department for the payment of this claim of $5,044." Id. The Senate Report concluded that "no attempt was made by the heirs of General Sevier to obtain compensation therefor between the years 1796 and 1907, a period of over 100 years," and that therefore "this claim is unjust, inequitable, and should be disallowed." Id.

Also among the documents attached to plaintiff's original complaint is a letter dated November 2, 1950 from the Office of the Clerk of the United States Court of Claims, apparently in response to an inquiry from former United States Representative Paul J. Kilday, regarding the status of the claims made by the heirs to General Sevier and John Sevier, Jr. The letter confirms that the House Committee on Private Land Claims referred these claims to the Court of Claims for findings of fact, that "the Court on February 28, 1910, filed its findings of fact . . . but without recommending any allowance for the claimant," and that such findings were certified to Congress and reported on January 23, 1913. The letter also stated that "as far as the court is concerned, the Sevier case has been a closed matter since its certification to Congress in 1913."

After plaintiff's amended complaint was filed, defendant filed a motion to dismiss pursuant to RCFC 12(b)(1) (2015), or, in the alternative, RCFC 12(b)(6) (2015), for lack

of subject matter jurisdiction and failure to state a claim, respectively. After numerous delays by the plaintiff, defendant's motion has been fully briefed.

## DISCUSSION

The court recognizes that plaintiff is proceeding pro se. When determining whether a complaint filed by a pro se plaintiff is sufficient to invoke review by a court, pro se plaintiffs are entitled to liberal construction of their pleadings. See Haines v. Kerner, 404 U.S. 519, 520–21 (requiring that allegations contained in a pro se complaint be held to "less stringent standards than formal pleadings drafted by lawyers"), reh'g denied, 405 U.S. 948 (1972); see also Erickson v. Pardus, 551 U.S. 89, 94 (2007); Hughes v. Rowe, 449 U.S. 5, 9–10 (1980); Estelle v. Gamble, 429 U.S. 97, 106 (1976), reh'g denied, 429 U.S. 1066 (1977); Matthews v. United States, 750 F.3d 1320, 1322 (Fed. Cir. 2014); Diamond v. United States, 115 Fed. Cl. 516, 524 (2014), aff'd, 603 F. App'x 947 (Fed. Cir.), cert. denied, 135 S. Ct. 1909 (2015). "However, "'[t]here is no duty on the part of the trial court to create a claim which [the plaintiff] has not spelled out in his [or her] pleading.'"" Lengen v. United States, 100 Fed. Cl. 317, 328 (2011) (alterations in original) (quoting Scogin v. United States, 33 Fed. Cl. 285, 293 (1995) (quoting Clark v. Nat'l Travelers Life Ins. Co., 518 F.2d 1167, 1169 (6th Cir. 1975))); see also Bussie v. United States, 96 Fed. Cl. 89, 94, aff'd, 443 F. App'x 542 (Fed. Cir. 2011); Minehan v. United States, 75 Fed. Cl. 249, 253 (2007). "While a pro se plaintiff is held to a less stringent standard than that of a plaintiff represented by an attorney, the pro se plaintiff, nevertheless, bears the burden of establishing the Court's jurisdiction by a preponderance of the evidence." Riles v. United States, 93 Fed. Cl. 163, 165 (2010) (citing Hughes v. Rowe, 449 U.S. at 9 and Taylor v. United States, 303 F.3d 1357, 1359 (Fed. Cir.) ("Plaintiff bears the burden of showing jurisdiction by a preponderance of the evidence."), reh'g and reh'g en banc denied (Fed. Cir. 2002)); see also Shelkofsky v. United States, 119 Fed. Cl. 133, 139 (2014) ("[W]hile the court may excuse ambiguities in a pro se plaintiff's complaint, the court 'does not excuse [a complaint's] failures.'" (quoting Henke v. United States, 60 F.3d 795, 799 (Fed. Cir. 1995)); Harris v. United States, 113 Fed. Cl. 290, 292 (2013) ("Although plaintiff's pleadings are held to a less stringent standard, such leniency 'with respect to mere formalities does not relieve the burden to meet jurisdictional requirements.'" (quoting Minehan v. United States, 75 Fed. Cl. at 253)).

Even granting the more liberal construction afforded to a complaint filed by a pro se plaintiff, plaintiff has not met his burden of showing that this court has jurisdiction to hear the claims contained in his complaint. It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 131 S. Ct. 1197, 1202 (2011); see also Gonzalez v. Thaler, 132 S. Ct. 641, 648 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider sua sponte issues that the parties have disclaimed or have not presented."); Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction

exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990)); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy." Sebelius v. Auburn Reg'l Med. Ctr., 133 S. Ct. 817, 824 (2013); see also Arbaugh v. Y & H Corp., 546 U.S. at 506 ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506–07)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise sua sponte, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006); see also Avid Identification Sys., Inc. v. Crystal Import Corp., 603 F.3d 967, 971 (Fed. Cir.) ("This court must always determine for itself whether it has jurisdiction to hear the case before it, even when the parties do not raise or contest the issue."), reh'g and reh'g en banc denied, 614 F.3d 1330 (Fed. Cir. 2010), cert. denied, 5 U.S. 1169 (2011).

Pursuant to the RCFC and the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2) (2015); Fed. R. Civ. P. 8(a)(1), (2) (2015); see also Ashcroft v. Iqbal, 556 U.S. 662, 677–78 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–57, 570 (2007)). "Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1 (1983)), reh'g denied (Fed. Cir. 1997); see also Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 208 (2011); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 713 (2010). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d

8

1317, 1322 (Fed. Cir. 1998); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. Wright and A. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004)). "A plaintiff's factual allegations must 'raise a right to relief above the speculative level' and cross 'the line from conceivable to plausible.'" Three S Consulting v. United States, 104 Fed. Cl. 510, 523 (2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555), aff'd, 562 F. App'x 964 (Fed. Cir.), reh'g denied (Fed. Cir. 2014). As stated in Ashcroft v. Iqbal, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' 550 U.S. at 555. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555).

The Tucker Act grants jurisdiction to this court as follows:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2012). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289–90 (2009); United States v. Mitchell, 463 U.S. 206, 216 (1983); see also Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999).

"Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States . . . ." United States v. Mitchell, 463 U.S. at 216; see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003); Smith v. United States, 709 F.3d 1114, 1116 (Fed. Cir.), cert. denied, 134 S. Ct. 259 (2013); RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d at 1343 ("[P]laintiff must . . . identify a substantive source of law that creates the right to recovery of money damages against the United States."); Golden v. United States, 118 Fed. Cl. 764, 768 (2014). In Ontario Power Generation, Inc. v. United States, the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims. The court wrote:

The underlying monetary claims are of three types. . . . First, claims alleging the existence of a contract between the plaintiff and the government fall

9

within the Tucker Act's waiver. . . . Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." Eastport S.S. [Corp. v. United States, 178 Ct. Cl. 599, 605–06,] 372 F.2d [1002,] 1007-08 [(1967)] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket'" (quoting Clapp v. United States, 127 Ct. Cl. 505, 117 F. Supp. 576, 580 (1954)) . . . . Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S., 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also [United States v. ]Testan, 424 U.S. [392,] 401-02 [1976] ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim-whether it be the Constitution, a statute, or a regulation-does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting Eastport S.S., 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

Ontario Power Generation, Inc. v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004); see also Twp. of Saddle Brook v. United States, 104 Fed. Cl. 101, 106 (2012).

To prove that a statute or regulation is money-mandating, a plaintiff must demonstrate that an independent source of substantive law relied upon "'can fairly be interpreted as mandating compensation by the Federal Government.'" United States v. Navajo Nation, 556 U.S. at 290 (quoting United States v. Testan, 424 U.S. 392, 400 (1976)); see also United States v. White Mountain Apache Tribe, 537 U.S. at 472; United States v. Mitchell, 463 U.S. at 217; Blueport Co., LLC v. United States, 533 F.3d 1374, 1383 (Fed. Cir. 2008), cert. denied, 555 U.S. 1153 (2009). The source of law granting monetary relief must be distinct from the Tucker Act itself. See United States v. Navajo Nation, 556 U.S. at 290 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts)."). "'If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction.'" Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1308 (Fed. Cir. 2008) (quoting Greenlee Cnty., Ariz. v. United States, 487 F.3d at 876); Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (The absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act."); Peoples v. United States, 87 Fed. Cl. 553, 565–66 (2009).

Pursuant to 28 U.S.C. § 2501 (2012), suits against the United States are subject to a six-year statute of limitations. According to 28 U.S.C. § 2501:

Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues. . . . A petition on the claim of a person under legal disability or beyond the seas at the time the claim accrues may be filed within three years after the disability ceases.

Id. "The six-year statute of limitations set forth in section 2501 is a jurisdictional requirement for a suit in the Court of Federal Claims." John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1354 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006), aff'd, 552 U.S. 130 (2008); Banks v. United States, 102 Fed. Cl. 115, 127 (2011) (citing U.S.C. § 2501). The United States Court of Appeals for the Federal Circuit has indicated that a claim accrues ""'when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money."'" San Carlos Apache Tribe v. United States, 639 F.3d 1346, 1358-59 (Fed. Cir.) (quoting Samish Indian Nation v. United States, 419 F.3d 1355, 1369 (Fed. Cir. 2005) (quoting Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003), cert. denied, 540 U.S. 1177 (2004))), reh'g en banc denied (Fed. Cir. 2011); see also FloorPro, Inc. v. United States, 680 F.3d 1377, 1381 (Fed. Cir. 2012); Martinez v. United States, 333 F.3d at 1303) ("A cause of action cognizable in a Tucker Act suit accrues as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, i.e., when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.'" (quoting Nager Elec. Co. v. United States, 177 Ct. Cl. 234, 240, 368 F.2d 847, 851 (1966), motion denied, 184 Ct. Cl. 390, 396 F.2d 977 (1968)); Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988); see also Brizuela v. United States, 103 Fed. Cl. 635, 639, aff'd, 492 F. App'x 97 (Fed. Cir. 2012), cert. denied 133 S. Ct. 1645 (2013). A Judge of the United States Court of Federal Claims has noted that:

It is well-established that a claim accrues under section 2501 "when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.'" Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc), cert. denied, 540 U.S. 1177 (2004) (quoting Nager Elec. Co. v. United States, 368 F.2d 847, 851 (Ct. Cl. 1966)); see also Samish [Indian Nation v. United States], 419 F.3d [1355,] 1369 [(2005)]. Because, as noted, this requirement is jurisdictional, plaintiff bears the burden of demonstrating that its claims were timely. See Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998); Entines v. United States, 39 Fed. Cl. 673, 678 (1997), aff'd, 185 F.3d 881 (Fed. Cir.), cert. denied, 526 U.S. 1117 (1999); see also John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1362 (Fed. Cir. 2006) (Newman, J., dissenting); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

Parkwood Assocs. Ltd. P'ship v. United States, 97 Fed. Cl. 809, 813-14 (2011), aff'd, 465 F. App'x 952 (Fed. Cir. 2012); see also Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. at 209 (2011) (citing Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998)). Accrual of a claim is "'determined under an objective standard'" and

plaintiff does not have to possess actual knowledge of all the relevant facts in order for a cause of action to accrue. FloorPro, Inc. v. United States, 680 F.3d at 1381 (quoting Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996)).

Like other claims brought under the Tucker Act, takings claims typically accrue "'only when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence.'" Casitas Mun. Water Dist. v. United States, 708 F.3d 1340, 1359 (Fed. Cir. 2013) (emphasis in original) (quoting Hopland Band of Pomo Indians v. United States, 855 F.2d at 1577); see also Navajo Nation v. United States, 631 F.3d 1368, 1273-74 (Fed. Cir. 2011) ("In general, a takings 'claim first accrues when all the events have occurred which fix the alleged liability of the [government] and entitle the plaintiff to institute an action.'" (quoting Hopland Band of Pomo Indians v. United States, 855 F.2d at 1577 (citing Fallini v. United States, 56 F.3d at 1380); John R. Sand & Gravel Co. v. United States, 457 F.3d at 1355-56. "'Therefore, a claim under the Fifth Amendment accrues when [the] taking action occurs.'" Navajo Nation v. United States, 631 F.3d at 1273-74 (brackets in original) (quoting Goodrich v. United States, 434 F.3d 1329, 1333 (Fed. Cir.), reh'g denied (Fed. Cir. 2006) (citations and internal quotation marks omitted)). For a physical taking, the act that causes the taking also causes the accrual of a takings claim. See Casitas Mun. Water Dist. v. United States, 708 F.3d at 1359 (citing Ingrum v. United States, 560 F.3d 1311, 1314 (Fed. Cir.) ("[A] claim alleging a Fifth Amendment taking accrues when the act that constitutes the taking occurs."), cert. denied, 558 U.S. 878 (2009)).

Defendant moves to dismiss plaintiff's amended complaint pursuant to RCFC 12(b)(1) for lack of jurisdiction and, in the alternative, RCFC 12(b)(6) for failure to state a claim for which relief may be granted. Defendant argues that plaintiff's first claim accrued no later than 1806, when Congress allegedly passed a statute acknowledging pre-existing property rights in the newly-created State of Tennessee, including, by implication, the property rights of General Sevier at issue in plaintiff's first claim. Defendant contends that plaintiff's second claim accrued no later than 1814, when Congress allegedly passed an Act providing for the indemnification of property owners in the Mississippi Territory dispossessed by the cession of land by the State of Georgia to the United States. Defendant argues that plaintiff's third claim accrued no later than 1824, when Congress allegedly passed an Act confirming the Georgia legislature's 1786 grant of 5,000 acres to General Sevier, with the proviso that the claim be satisfied from a trust established in 1803. Defendant argues plaintiffs fourth claim accrued no later than 1793 because plaintiff alleges General Sevier "was owed military pay in the amount of $22,817 for services provided in 1793." Finally, defendant construes the reference in plaintiff's appendix to an 1841 bill, under which claims for compensation allegedly could have been brought by the heirs of General Sevier or John Sevier, Jr., as a fifth claim, which, defendant asserts, accrued no later than 1841. Citing 28 U.S.C. § 2501, defendant argues that "Congress has required persons seeking to recover under the Tucker Act to file suit in this Court within six years of the date when the claim accrued," and that because none of plaintiff's claims accrued later than 1841, they are untimely and must be dismissed for lack of jurisdiction. Further, according to defendant, even if plaintiff's complaint were not dismissed for its jurisdictional defects, it must be dismissed under RCFC 12(b)(6) for

failure to state a claim for which relief may be granted, because plaintiff's complaint "contains no allegations to support a finding that the estate of General Sevier has remained open for the 200 years since General Sevier's death" and it "also contains no allegations to support a finding that Mr. Cordova has been properly appointed the administrator of such an estate."

Plaintiff's Response to Defendant's Motion to Dismiss asserts, although without support, that "28 U.S.C. 2501 does not apply in this matter as the U.S. Congress has referred the matter and that a ruling was made adversely against the Defendant. It is contended that the case was appropriated for payment, yet merely indefinitely postponed by this Court." Therefore, plaintiff argues, he "has already met the provisions of the Tucker Act and previously of the Bowman Act of 1883." Plaintiff further asserts that "[t]he United States Congress, on several occasions over that last 200 years, has made appropriations for payment to the Sevier Estate," including, plaintiff alleges, the Deficiency Appropriation Act of 1964, ch. XI, 78 Stat. 204, which, he claims, "did not recognize the amounts or terms of the individual settlements and judgments funded but rather made a bulk appropriation," in the amount of $12,831,443.00, "'[f]or payment of claims as settled and determined by departments and agencies in accord with law, and judgments rendered against the United States by the United States Court of Claims and United States district courts . . . .'" There is no indication in the record, however, that any appropriation regarding the Sevier claims was ever passed by Congress following the Congressional Reference Report by the Court of Claims, and plaintiff has provided none.

With respect to defendant's allegation that Mr. Cordova has failed to establish that the estates of General Sevier and John Sevier, Jr. remain open, or that he is the duly-appointed administrator thereof, plaintiff asserts that "Mr. Cordova, a direct descendant of Gen. Sevier, made application [to] the Sevier County Court in Tennessee in 2012 to become the Estate's Administrator, which Mr. Cordova can document." The court notes, however, that plaintiff has not provided the referenced documentation, nor did he provide any information regarding the status of his 2012 application, including whether or not the application ever was acted upon. Plaintiff further states in his conclusion that "the Complainant believes that it has proven and can submit additional evidence that this court has jurisdiction," but that "the Complainant has requested additional documents pertinent to this case from agencies of the Defendant, which have not yet been received." Since the filing of the plaintiff's complaint in this court, however, plaintiff has had ample time to produce additional documents and has not done so.

In its reply brief, defendant asserts that "[i]n his response, Mr. Cordova does not challenge (or mention) the accrual date for any of these five claims" identified in defendant's motion to dismiss, which, defendant alleges, means that "our calculations of the accrual dates are uncontested." Defendant alleges that plaintiff's reliance on the findings of fact issued by the United States Court of Claims in 1910 "lends no support to Mr. Cordova's arguments for jurisdiction to consider the claims in the complaint" because, although defendant concedes that "Congress created special jurisdiction for the Court of Claims" to consider the claims of General Sevier's heirs, "by the express terms of that grant of jurisdiction . . . jurisdiction expired with the issuance of the Court of Claims report in 1910, and the elapsed time permitted for appeal." As for plaintiff's assertion that he

applied in 2012 to be appointed as the administrator of General Sevier's estate, defendant argues that "this does not prove that General John Sevier's estate was established there, or that such estate has remained open for 200 years, or that Mr. Cordova has been *appointed* as the Estate Administrator of such an open estate." (emphasis in original). With respect to plaintiff's apparent claim that the Court of Claims issued a judgment in favor of the heirs of General Sevier's estate in 1910, defendant retorts that, "[w]ith all due respect, Mr. Cordova misunderstands the report issued by the Court of Claims in 1910." Defendant concludes after discussing the 1910 fact-finding report, "the Court of Claims did not award, or recommend the award, of any money to the heirs of General Sevier or his son," meaning "[t]here is no judgment for Mr. Cordova to seek to enforce."

Plaintiff's argument that the statute of limitations contained in 28 U.S.C. § 2501 does not apply to the present case because it was referred to the court by Congress and then "indefinitely postponed" also is incorrect. "Any bill, except a bill for a pension, may be referred by either House of Congress to the chief judge of the United States Court of Federal Claims for a report in conformity with [28 U.S.C. §] 2509." 28 U.S.C. § 1492 (2012). After a bill is referred, the Court of Federal Claims makes findings of fact regarding the referred bill along with "conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant." 28 U.S.C. § 2509(c) (2012). These findings and conclusions are then submitted in a report to the appropriate House of Congress. Id. § 2509(e). Essentially the same process was followed by the Court of Claims in 1910. See Tucker Act of 1887, ch. 359, § 13-14, 24 Stat. 505, 507-08 (1887). None of the conclusions drawn in such reports are subject to judicial review. See id. § 2509(b). "Inasmuch as the conclusions are recommendations, as distinguished from judicial decisions, the court-made rules of *stare decisis* and *res judicata* do not apply. Congressional reference cases have no binding value as precedent." Paul v. United States, 20 Cl. Ct. 236, 266, aff'd, 21 Cl. Ct. 758 (1990). As noted above, the Humphreys claims were twice referred to the Court of Claims, first in 1905 and then in 1908. S. Rep. 68-991 at 1-2 (quoting H.R. 18921, 58th Cong. (1905); H.R. 17355, 60th Cong. (1908)). After the Court of Claims made its findings in Humphreys and submitted them to the House of Representatives in 1913, see H.R. Doc. No. 63-131 at 1, the role of the Court of Claims was complete and the court's jurisdiction to hear the Humphreys claims referred by Congress expired. The court's findings were only recommendations, and the ultimate decision of Congress about whether to award the Humphreys plaintiff compensation rested with Congress alone. Congress' decision in 1925 not to do so did not toll the running of the statute of limitations for the claims involved. Moreover, as noted above, there is no evidence in the record that Congress ever appropriated any money directed to compensate for plaintiff's claims.

For plaintiff's claims to be timely, pursuant to 28 U.S.C. § 2501, each claim must have accrued no earlier than November 18, 2008, or six years prior to November 18, 2014, the date on which Mr. Cordova filed his initial complaint in this court. As defendant argues, each of Mr. Cordova's four claims accrued considerably earlier than that date. Plaintiff's first claim involves lands allegedly belonging to General Sevier and John Sevier, Jr. in Tennessee that were allegedly "ceded" by the federal government to the Cherokee Nation in 1785 and/or 1791. Construed liberally, plaintiff alleges a physical taking of

14

General Sevier and John Sevier Jr.'s lands by the United States. The statute of limitations, therefore, began running the moment the land was taken, that is in 1791, at the latest. See Navajo Nation v. United States, 631 F.3d at 1273-74 ("'[A] claim under the Fifth Amendment accrues when [the] taking action occurs.'" (brackets in original) (quoting Goodrich v. United States, 434 F.3d at 1333). Plaintiff's first takings claim, thus, is untimely by at least 217 years. The 1925 Senate Report included in the appendix to plaintiff's complaint also alleged that several federal statutes, the last of which was enacted in 1841, provided General Sevier's heirs the opportunity to receive compensation for the lands allegedly taken from General Sevier and John Sevier, Jr. See S. Report 68-991, at 2-3. These are the statutes defendant construed as constituting a fifth claim by defendant. There is, however, no indication in plaintiff's pleadings or the exhibits in the record before the court that the claims of General Sevier and his heirs would not have accrued immediately after the enactment of such statutes. Any claims plaintiff might have had under such statutes are, therefore, untimely by at least 167 years.

Plaintiff's second claim alleges that two federal statutes, passed in 1803 and 1814, were intended to compensate landowners, such as General Sevier and James Sevier, whose land had been ceded by the State of Georgia to the United States in order to establish the Mississippi Territory. The 1803 statute allegedly established a procedure by which claims for compensation could be made, while the 1814 statute allegedly provided for "indemnification of certain claimants of public lands in the Mississippi Territory." The statute of limitations for claims based on such money-mandating statutes, however, begins running "'when "all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for [its] money."'" Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. at 209 (brackets in original) (quoting Martinez v. United States, 333 F.3d at 1303 (quoting Nager Elec. Co. v. United States, 368 F.2d at 851)). In the above-captioned case, plaintiff has not pled any facts showing why General Sevier would not have been entitled to seek compensation or indemnification pursuant to the 1803 and 1814 statutes, even if eligible, suggesting that the statute of limitations began to run when these acts were passed. As such, plaintiff's claims under the two statutes would be untimely by 205 and 194 years, respectively.

Plaintiff's third claim involves lands that were allegedly granted to the heirs of General Sevier by Congress in 1824. Plaintiff alleges that "about 20 patents" apparently covering this land were recorded in 1828, but that they were occupied by Native Americans and that United States citizens were prevented from going on the lands by the United States Army. Plaintiff also alleges that "there is no record in the Land Office at Washington, D.C., Huntsville, Alabama, or Jackson, Mississippi to show that any patents were delivered to any of the heirs of General John Sevier or to his administrators." The legal basis for plaintiff's third claim is unclear. When construed liberally, however, plaintiff appears to allege that the lands given to General Sevier in 1824 were subsequently taken by the United States and given to the certain Native Americans beginning at least in 1828. Again, because plaintiff's claim involves a taking, the statute of limitations began to run when the taking occurred in 1828. Plaintiff's third claim is, therefore, untimely by approximately 180 years.

Plaintiff's fourth claim involves the alleged payments owed General Sevier for his military service: "the salary of General John Sevier of $94 per month from February 22, 1791 to February 22, 1794, and the sum due him for raising levies for the Northwestern campaign." Plaintiff does not cite to the appropriate money-mandating regulation, statute, or constitutional provision that would have entitled General Sevier or any of his heirs to such payments. Nonetheless, plaintiff's claims would have accrued, at the latest, when General Sevier's military service ended in 1794. Therefore, plaintiff's fourth claim is untimely by at least 214 years. Given that each of plaintiff's four claims began to accrue hundreds of years ago, they all must be dismissed for lack of jurisdiction pursuant to RCFC 12(b)(1). The court, therefore, does not need to reach defendant's RCFC 12(b)(6) arguments, or address why plaintiff has the legal right to bring claims on behalf of General Sevier, his sons, or their estates, of which there is no evidence in the record.

Along with his original complaint, Mr. Cordova submitted an Application to Proceed In Forma Pauperis, asserting that he is unable to pay the required filing fees, and requesting waiver of court costs and fees. In his application, plaintiff states that he is presently unemployed, and that his only source of income in the last twelve months has been "VA DISABILITY," but he did not specify the amount received from this source, despite the form's instruction to "describe each source of money and state the amount received from each during the past twelve months." (capitalization in original). Plaintiff further states that he does not own any cash, and has no money in checking, savings, or any other accounts. Plaintiff responded "Yes" in response to the query "Do you own any real estate, stocks, bonds, notes, automobiles or other valuable property (excluding ordinary household furnishings and clothing)?" and estimated the value of his property in San Antonio, Texas as $40,000.00. Finally, plaintiff indicates that he has no dependents and is not currently a prisoner.

In order to provide access to this court to those who cannot pay the filing fees mandated by RCFC 77.1(c) (2015), the statute at 28 U.S.C. § 1915 (2012) permits a court to allow plaintiffs to file a complaint without payment of fees or security under certain circumstances.[7] The standard in 28 U.S.C. § 1915(a)(1) for in forma pauperis eligibility is

---

[7] A number of courts have reviewed the words of 28 U.S.C. § 1915(a)(1), regarding in forma pauperis applications by non-prisoner litigants in federal courts, and have concluded that Congress did not intend for non-prisoners to be barred from being able to proceed in forma pauperis in federal court. See, e.g., Floyd v. United States Postal Serv., 105 F.3d 274, 275-76 (6th Cir.), reh'g denied (6th Cir. 1997); Schagene v. United States, 37 Fed. Cl. 661, 663 (1997) (finding that it was not the intent of Congress to eliminate the in forma pauperis right of access to federal courts of eligible, indigent, non-prisoners), appeal dismissed, 152 F.3d 947 (Fed. Cir. 1998); see also In re Prison Litigation Reform Act, 105 F.3d 1131, 1134 (6th Cir. 1997) (discussing how to administer in forma pauperis rights to a non-prisoner, thereby acknowledging the rights of non-prisoners to apply for in forma pauperis status); Leonard v. Lacy, 88 F.3d 181, 183 (2d Cir. 1996) (using "sic" following the word "prisoner" in 28 U.S.C. § 1915(a)(1) seemingly to indicate that the use of that word was too narrow); Smith v. United States, 113 Fed. Cl. 241, 243 (2013); Powell v. Hoover, 956 F. Supp. 564, 566 (M.D. Pa. 1997) (holding that a "fair reading of the entire section [28 U.S.C. § 1915(a)(1)] is that it is not limited to prisoner suits."). Moreover, 28

"unable to pay such fees or give security therefor." Determination of what constitutes "unable to pay" or unable to "give security therefor," and, therefore, whether to allow a plaintiff to proceed in forma pauperis, is left to the discretion of the presiding judge, based on the information submitted by the plaintiff or plaintiffs. See, e.g., Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 217–18 (1993); Fuentes v. United States, 100 Fed. Cl. 85, 92 (2011). In Fiebelkorn v. United States, the United States Court of Federal Claims indicated:

> [T]he threshold for a motion to proceed in forma pauperis is not high: The statute requires that the applicant be "unable to pay such fees." 28 U.S.C. § 1915(a)(1). To be "unable to pay such fees" means that paying such fees would constitute a serious hardship on the plaintiff, not that such payment would render plaintiff destitute.

Fiebelkorn v. United States, 77 Fed. Cl. 59, 62 (2007); see also Hayes v. United States, 71 Fed. Cl. 366, 369 (2006). Although Mr. Cordova's self-reported income and holdings might qualify him for in forma pauperis relief, his complaint is being dismissed for lack of jurisdiction for the reasons discussed above.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss for lack of subject matter jurisdiction is hereby **GRANTED**. Plaintiff's complaint is **DISMISSED**. The allegations in this claim, have been repeatedly reasserted by different individuals in General Sevier's lineage. The claims were resolved by the 1910 Congressional Reference Report and the Senate Report based on the same facts. Even if Mr. Cordova could demonstrate a legal right to act on behalf of the Sevier estates, the issues raised by plaintiff's complaint should not be revisited again in this court. The Clerk of the Court shall enter **JUDGMENT** consistent with this Order dismissing plaintiff's complaint.

**IT IS SO ORDERED.**

**MARIAN BLANK HORN**
**Judge**

---

U.S.C. § 1915(a)(1) refers to both "person" and "prisoner." The word "person" is used three times in the subsection, while the word "prisoner" is used only once. This court, therefore, finds that the single use of the word "prisoner" in the language of 28 U.S.C. § 1915(a)(1) was not intended to eliminate a non-prisoner from proceeding in federal court in forma pauperis, provided that the civil litigant can demonstrate appropriate need. Any other interpretation is inconsistent with the statutory scheme of 28 U.S.C. § 1915.